JAMES C. NIELSEN (111889)
 *jnielsen@nielsenhaley.com*
CHRISTINE YOUNG (253964)
 *cyoung@nielsenhaley.com*
NIELSEN, HALEY & ABBOTT LLP
100 Smith Ranch Road, Suite 350
San Rafael, California 94903
Telephone:  (415) 693-0900
Facsimile:  (415) 693-9674

Attorneys for Defendants,
CYBERNET ENTERTAINMENT, LLC;
KINK STUDIOS, LLC; ARMORY
STUDIOS, LLC; AND PETER ACWORTH

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| SENECA INSURANCE COMPANY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CYBERNET ENTERTAINMENT, LLC; *et al.*,<br><br>Defendants. | No.:  4:16-CV-06554-YGR<br><br>**THIRD PARTY PLAINTIFF CYBERNET ENTERTAINMENT, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST STATE COMPENSATION INSURANCE FUND AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** |
| CYBERNET ENTERTAINMENT, LLC,<br><br>Third Party Plaintiff,<br><br>v.<br><br>STATE COMPENSATION INSURANCE FUND,<br><br>Third Party Defendant. | **F.R.C.P. Rule 56**<br><br>Date:         July 18, 2017<br>Time:         2:00 p.m.<br>Courtroom:  1, 4th Floor<br>Judge:        Hon. Yvonne Gonzalez Rogers |

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION……………………………………………………1

STATEMENT OF ISSUE TO BE DECIDED……………………………………………1

INTRODUCTION………………………………………………………………………1

FACTS……………………………………………………………………………………3

      A.     The Underlying Actions…………………………………………………3

            1.     The *Doe* action…………………………………………………3

            2.     The *Adams* action………………………………………………4

            3.     The *Rodgers* action……………………………………………6

            4.     The Cybernet defendants' demurrers…………………………6

      B.     The State Fund Policy……………………………………………………7

            1.     The policy terms…………………………………………………7

            2.     State Fund's response to the underlying actions………………7

ARGUMENT………………………………………………………………………………7

      1.     State Fund must defend the Cybernet Defendants because a potential exists for liability covered under Part Two of the State Fund policy……………………8

      2.     The underlying actions trigger coverage under Part Two because they allege workplace injuries by accident and disease……………………………………9

      3.     The underlying actions trigger coverage under Part Two because they allege workplace injuries beyond the normal risks of employment………………………10

            A.     The underlying actions allege injuries that fall within common-law exceptions to the workers' compensation exclusivity rule………………………12

            B.     The underlying actions allege injuries that fall within a statutory exception to the workers' compensation exclusivity rule……………………………………13

      4.     State Fund has a duty to defend because no policy exclusions preclude coverage...15

            A.     The Workers' Compensation Exclusion does not preclude coverage because the underlying plaintiffs allege injuries outside the compensation bargain…….15

            B.     The Intentional-Injury Exclusion does not preclude coverage because State fund cannot conclusively prove Cybernet intended to injure the underlying plaintiffs………………………………………………………………………...17

1

**CONCLUSION**...................................................................................18

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

# TABLE OF AUTHORITIES

3

**Cases**

4

*Arriaga v. County of Alameda*, 9 Cal.4th 1055 (1995) .......................................... 17

5

*Atlanic Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017 (2002)...................... 15, 19

6

*Baptist v. Robinson*,143 Cal.App.4th 151 (2006).................................................. 15

7

*Belmonte v. Employers Ins. Co*., 83 Cal.App.4th 430 (2000) .......................................... 8

8

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................................ 8

9

*Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865 (1978).............................................. 17

10

*Culligan v. State Comp. Ins. Fund*, 81 Cal.App.4th 429 (2000) ................................ 8, 17

11

*Delgado v. Interins. Exch. of Auto. Club of So. Cal*., 47 Cal.4th 302 (2009). ............... 10

12

*Fermino v. Fedco*, 7 Cal.4th 701 (1994) ....................................................... 12, 13, 18

13

*Fretland v. County of Humboldt*, 69 Cal.App.4th 1478 (1999) ...................................... 13

14

*Gonzalez v. Fire Ins. Exch.*, 234 Cal.App.4th 1220 (2015) ....................................... 17

15

*Gray v. Zurich Ins. Co.*, 65 Cal.2d 263 (1966).................................................. 8, 18

16

*Hart v. National Mortgage & Land Co.*, 189 Cal.App.3d 1420 (1987)....................... 13, 14

17

*Herrick v. Quality Hotels, Inns & Resorts, Inc.*, 19 Cal App 4th 1608 (1993) ............... 14

18

*Hogan v. Midland National Ins. Co.*, 3 Cal.3d 553 (1970) ......................................... 8

19

*Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076 (1993). ..................................... 8

20

*La Jolla Beach & Tennis Club, Inc. v. Industrial Indem*. Co., 9 Cal.4th 27 (1994)..................... 8, 9

21

*Lee v. W. Kern Water Dist.*, 5 Cal.App.5th 606 (2016)............................................... 12

22

*Merced Mut. Ins. Co. v. Mendez*, 213 Cal.App.3d 41 (1989)....................................... 9

23

*Mirpad, LLC v. California Ins. Guarantee Assn.*, 132 Cal.App.4th 1058, 1068 (2005)........... 15, 18

24

*Montrose Chemical Corp. v. Sup. Ct.*, 6 Cal.4th 287 (1993) ................................ 8, 16, 18

25

*Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 41 Cal.3d 903 (1986)....................... 16

26

*Quan v. Truck Ins. Exch*., 67 Cal.App.4th 583 (1998) ................................................ 10

27

*Rakestraw v. Rodrigues*, 8 Cal.3d 67 (1972).......................................................... 13

28

*StreetScenes v. ITC Entertainment Group, Inc.*, 103 Cal.App.4th 233 (2002) ............... 15

*Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 19 (1995) ........................................................... 16

**Statutes**

Cal. Lab. Code § 3600……………………………………………………………………………..12

Cal. Lab. Code § 3602 ...................................................................................................... 15

Fed. R. Civ. P. 56 ............................................................................................................... 8

**Rules**

L.R. 7-4 ................................................................................................................................. 1

## NOTICE OF MOTION AND MOTION

On July 18, 2017, at 2:00 p.m. in the United States District Court for the Northern District of California, Oakland Courthouse, Courtroom 1, 4th Floor, 1301 Clay Street, Oakland, California, Third Party Plaintiff Cybernet Entertainment, LLC, will and hereby does move for partial summary judgment per F.R.Civ.P. Rule 56 and Civil Local Rule 7-2.

Per L.R. 7-2 (b)(3), the relief sought is a judgment declaring that Third Party Defendant State Compensation Insurance Fund (State Fund) has a duty to defend Cybernet against the claims asserted in three underlying actions filed by John Doe, Cameron Adams, and Joshua Rodgers in the San Francisco Superior Court.

Cybernet's motion is based upon this notice, the accompanying memorandum of points and authorities, the request for judicial notice and accompanying exhibits, the declaration of James C. Nielsen and accompanying exhibits, the declaration of Karen Tynan and accompanying exhibits, the separate statement of undisputed facts, and on all such further evidence, documents and argument as may be presented to the Court at or before the hearing on this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF ISSUE TO BE DECIDED

Per L.R. 7-4 (a) (3), the issue to be decided in the motion is whether the underlying actions against Cybernet create a potential for liability covered under Part Two of State Fund's policy.

### INTRODUCTION

Cybernet Entertainment, LLC, seeks a declaration that State Fund has a duty to defend Cybernet against three underlying actions in San Francisco Superior Court. Cybernet produces adult content for the Internet offered primarily at the website Kink.com and specializing in depictions of various sexual fetishes, including bondage. Armory Studios, LLC owns the historic State Armory and Arsenal building in San Francisco, where the company conducts public tours and hosts public events and workshops. Despite the reputation of the adult-entertainment industry as a whole, and as the underlying plaintiffs themselves correctly allege, Kink.com has an usually strong reputation in industry for "respectful and fair treatment of [performers]." (Request for Judicial

Notice ["RJN"], ¶ 1, Ex. 1, ¶ 23.)  The company is reputed to provide, "clean, comfortable working conditions and an honest and approachable crew."  (*Id.*)  It "vows to 'ensure that [performers] fully understand their rights and feel empowered to stop or alter a scene at any time.'"  (*Id.*)  Cybernet has an extensive "Injury and Illness Prevention Plan" that instructs cast and crew members on how to film safely, and requires performers to fill out "Limits Sheets," which detail the types of activities performers are comfortable performing.  (Declaration of Karen Tynan, ¶ 10; RJN, ¶ 2, Ex. 2, ¶ 30.)  Thus, despite the eccentric, fanciful nature of its productions, Cybernet has developed a reputation in the industry for safety and within its community as a good neighbor, such that its business has been featured favorably in reports in national publications like the New York Times as well as the San Francisco Chronicle.  (Declaration of James C. Nielsen, ¶ 2, Ex. 1-2.)

To protect itself from the business risks attendant to its industry, Cybernet purchases a variety of insurance, including the State Fund policy of workers' compensation and employer's liability insurance at issue here.  (Tynan Decl., ¶ 3.)  This policy requires State Fund to defend and indemnify Cybernet against claims for damages arising from bodily injuries suffered in the course and scope of employment during the policy period.  (Nielsen Decl., ¶¶ 3-4, Ex. 3-4.)  Three plaintiffs filed suits against Cybernet alleging injuries suffered while performing in Cybernet videos during the policy period.  (RJN, ¶¶ 1-3, Ex. 1-3.)  State Fund initially agreed to defend Cybernet against these actions but later withdrew, contending that two exclusions precluded coverage: an exclusion for intentional injuries and an exclusion for injuries compensable under the workers' compensation law.  (Tynan Decl., ¶¶ 4-5, Ex. 1-2.)  But the intentional-injury exclusion does not apply because State Fund cannot show Cybernet intentionally injured the underlying plaintiffs.  The workers' compensation injury likewise does not apply because the underlying plaintiffs allege Cybernet acted outside the compensation bargain, such that they contend that workers' compensation is not their excusive remedy.

Because State Fund cannot conclusively show an exclusion defeats coverage, Cybernet is entitled to a partial summary judgment declaring that Cybernet owes a duty to defend Cybernet against the underlying actions.

///

1
## FACTS

2
### A.      The Underlying Actions

3    In 2015, three plaintiffs filed actions against Kink.com; Kink Studios, LLC; Cybernet

4    Entertainment, LLC; Armory Studios, LLC; Peter Acworth; and various other entities and

5    individuals who worked for Cybernet (collectively referred to as "Cybernet defendants").  (RJN, ¶¶

6    1-3, Ex. 1-3.)  The plaintiffs allege that, in 2013, they performed in adult films produced by

7    Kink.com and as a result suffered injuries that included infections of the human immunodeficiency

8    virus (HIV).  (*Id.*)  Cybernet vigorously denies the allegations—particularly because evidence

9    shows, among other things, that at least one of the plaintiffs had unprotected sex outside of his

10   work for Cybernet during the same period that he contends he contracted HIV.  (Tynan Decl.), ¶¶ 2,

11   7, Ex. 3, p. 000134.)  State Fund insured Cybernet for workplace injuries for the period of claimed

12   injury.  (Nielsen Decl., ¶¶ 3-4, Ex. 3-4.)

13                1.      The *Doe* action

14   In June 2015, "John Doe" filed a First Amended Complaint against Kink.com; Kink

15   Studios, LLC; Kinkmen.com; Cybernet Entertainment, LLC; Armory Studios, LLC; Peter Acworth;

16   and Hogan Karl in San Francisco Superior Court (No. CGC-15-545540).  (RJN, ¶ 1, Ex. 1.)  Doe

17   alleges that from November 7, 2011, to May 3, 2013, he performed sporadically in films produced

18   by Kink.com; he alleges he was assured that working for Kink.com was a "wise, safe decision."

19   (RJN, ¶ 1, Ex. 1, ¶¶ 25-26.)  Before participating in a shoot on May 3, 2013, Doe was also assured

20   that condoms and barriers would be required.  (RJN, ¶ 1, Ex. 1, ¶ 44.)  During the shoot, Doe

21   alleges that he was required "to perform oral sex on [another] performer … despite plaintiff's

22   request that he perform oral sex away from the location where the performer had an open wound

23   …."  (RJN, ¶ 1, Ex. 1 ,¶ 35.)  Doe alleges that the defendants "tied Doe's penis with twine, cutting

24   it and causing bleeding."  (RJN, ¶ 1, Ex. 1, ¶ 35.)  He claims that defendants "inserted a non-sterile

25   object into Doe's urethra." (RJN, ¶ 1, Ex. 1, ¶¶ 38-39.)  In the course of the May 3, 2013, shoot,

26   while Doe allegedly was "restrained and blindfolded, Defendant Darkholme [aka Karl]…forcefully

27   [pushed] Plaintiff's head and mouth into the penises of dozens of men to perform oral sex on them.

28   None of these performers were wearing a condom nor were any barriers used.  Defendant

1   Darkholme was so powerfully thrusting Plaintiff's head that Plaintiff is heard making gagging

2   sounds…..." (RJN, ¶ 1, Ex. 1, ¶¶ 49, 180-81.)  Perhaps most seriously, Doe alleges he contracted

3   HIV. (RJN, ¶ 1, Ex. 1, ¶ 55).

4        Doe generally alleges that defendants' actions were ratified by the officers or managing

5   agents of every other defendant.  (RJN, ¶ 1, Ex. 1, ¶ 20.)  Doe specifically alleges ratification of

6   May 3, 2013, actions by Cybernet employee Karl (aka Darkholme), who supposedly forced Doe to

7   perform oral sex on members of the public (RJN, ¶ 1, Ex. 1, ¶¶ 97-103, 108), and who "touched

8   and/or caused [Doe] to be touched with the intent to harm or offend him."  (RJN, ¶ 1, Ex. 1, ¶¶

9   180-184, 189.)  He claims ratification of the various defendants' failure "to protect Doe from

10  exposure to bloodborne pathogens and other potentially infections materials." (RJN, ¶ 1, Ex. 1, ¶¶

11  169-174.)  The *Doe* action is set for trial on January 13, 2018.  (Tynan Decl., ¶ 2.)

12        In July 2013, Doe also filed a claim for workers' compensation benefits.  (Tynan Decl., ¶¶

13  6-7, Ex. 3.)  Doe also sought additional benefits, claiming Cybernet had acted willfully in injuring

14  him.  (*Id.*)  In September 2013, State Fund denied Doe's claim because it claimed there was no

15  medical evidence that Doe's HIV infection arose out of his employment with Cybernet.  (*Id.* at p.

16  000131)  Doe appealed and his claim is pending before the Workers' Compensation Appeals Board

17  ("WCAB"). (*Id.*)

18             2.    The *Adams* action

19        In July 2015, Cameron Adams filed a civil suit against Kink.com; Kink Studios, LLC;

20  Publicdisgrace.com; Cybernet Entertainment, LLC; Armory Studios, LLC; Peter Acworth; Sara

21  Dierdorf Corrigan aka Lorelei Lee; and others in San Francisco Superior Court (No. CGC-15-

22  547035).  (RJN, ¶ 2, Ex. 2.)  Adams alleges that on July 31, 2013, she performed in an adult film

23  produced by Kink.com.  (RJN, ¶ 2, Ex. 2, ¶ 28.)  Before she agreed to work for Kink.com, Adams

24  alleges she was assured that Kink.com would provide a safe working environment, particularly

25  because Adams had no experience in the type of activity she would be portraying on film (bondage,

26  discipline, sadism, and masochism—BDSM).  (RJN, ¶ 2, Ex. 2, ¶ 27.)  Before filming, Adams

27  signed a "Limits Sheet," which documented the types of sexual interactions Adams was willing to

28  perform.  (RJN, ¶ 2, Ex. 2, ¶ 30.)  Adams alleges she was forced to engage in rough, nonconsensual

1   sex acts, including fisting, oral sex, spanking, and being hit with a cattle prod. (RJN, ¶ 2, Ex. 2, ¶¶

2   31, 35, 85, 182).  Adams alleges she later had to undergo surgery to repair an injury to her breast.

3   (RJN, ¶ 2, Ex. 2, ¶¶ 31, 35, 45, 47).  Adams alleges the director of the shoot, a Cybernet employee,

4   engaged in nonconsensual sex acts with Adams—despite Adams having indicated on her Limits

5   Sheet that she did not want to engage in such acts.  (RJN, ¶ 2, Ex. 2, ¶ 35.)  The director also

6   allowed other "extra" performers to contact Adams in a sexual manner, even though extras were

7   prohibited from doing so.  The director also failed to take proper safety measures when a fellow

8   performer started bleeding during filming.  (RJN, ¶ 2, Ex. 2, ¶¶ 32, 35(b),(c),(e), 182).  Finally,

9   Adams alleges she contracted HIV.  (RJN, ¶ 2, Ex. 2, ¶ 49.)

10      Adams generally alleges that defendants' actions were ratified by the officers or managing

11  agents of every other defendant.  (RJN, ¶ 2, Ex. 2, ¶ 22.)  Adams specifically alleges ratification of

12  July 31, 2013, actions by Cybernet employee Sara Corrigan (aka Lee), who allegedly battered

13  Adams, and directed and engaged in various non-consensual acts involving Adams, including sex

14  acts to which Adams did not consent, acts that exposed Adams to open wounds, acts that injured

15  Adams' breast, and acts that infected her with HIV.  (RJN, ¶ 2, Ex. 2, ¶¶ 85, 95, 182, 186, 188,

16  191.)  Adams also claims ratification of defendants' misrepresentation of the terms and conditions

17  of Adams' employment and failure to protect Adams and ensure Adams' safety on set, which

18  caused Adams to contract HIV.  (RJN, ¶ 2, Ex. 2, ¶¶ 84-90.)  The *Adams* action is set for trial on

19  September 25, 2017.  (Tynan Decl., ¶ 2.)

20      Adams also filed a claim for workers' compensation benefits in 2013.  (Tynan Decl., ¶ 6.)

21  Adams's initial workers' compensation claim was based on injuries to her breast and included a

22  claim for disability benefits.  (*Id.* at ¶¶ 6, 9, Ex. 5.)  While State Fund accepted Adams's claim, it

23  disputed that the treatment by her doctors was reasonable.  (*Id.,* p. 000004, 8.)  State Fund also

24  denied her claim for disability benefits because State Fund's records did not indicate Adams had

25  lost work time due to her injury.  (*Id.,* p. 000011.)  Adams appealed State Fund's denial and in her

26  appeal paperwork, Adams indicated she was seeking benefits related to her breast injury and HIV

27  infection.  (*Id.*, p. 000016.)  Adams's claim is pending before the WCAB.  (*Id.*)

28  ///

1          3.      The *Rodgers* action

2          Also in July 2015, Joshua Rodgers filed a civil suit against the Cybernet defendants and

3   others in San Francisco Superior Court (No. CGC-15-547036).  (RJN, ¶ 3, Ex. 3.)  Rodgers alleges

4   that on July 28, 2013; July 29, 2013; and August 1, 2013, he worked sporadically for Kink.com

5   performing in adult films.  (RJN, ¶ 3, Ex. 3, ¶¶ 39-41.)  Rodgers alleges he was assured that

6   working for Kink.com was a "wise, safe decision."  (RJN, ¶ 3, Ex. 3, ¶ 29.)  Rodgers also alleges

7   Kink represented to him that all same-sex video shoots required the use of condoms or barriers.

8   (RJN, ¶ 3, Ex. 3, ¶¶ 37, 84.)  Rodgers alleges that at the end of filming on August 1, 2013, another

9   performer ejaculated in Rodgers's eye and defendants failed to follow proper protocols associated

10  with exposure to bloodborne pathogens.  (RJN, ¶ 3, Ex. 3, ¶ 41.)  Rodgers also alleges defendants

11  misrepresented the terms of his work, failed to keep him safe during filming, and as a result, he

12  contracted HIV.  (RJN, ¶ 3, Ex. 3, ¶¶ 43, 84-87, 155-57.)

13         Rodgers also generally alleges all of defendants' actions were ratified and approved by the

14  officers or managing agents or member of every other defendant.  (RJN, ¶ 3, Ex. 3, ¶ 25.)  Rodgers

15  claims ratification of defendants' misrepresentation of the terms of Rodgers' employment and

16  failure to ensure Rodgers' safety on set, which caused Rodgers to contract HIV.  (RJN, ¶ 3, Ex. 3,

17  ¶¶ 84, 87-88, 93, 95, 102, 105.)  The *Rodgers* action is set for trial on January 16, 2018.  (Tynan

18  Decl., ¶ 2.)

19         Rodgers also filed a claim for workers' compensation benefits in 2013.  (Tynan Decl., ¶¶ 6,

20  8, Ex. 4.)  State Fund denied Rodgers's claim because it found no medical evidence that Rodgers's

21  HIV infection was caused by or arose out of his employment with Cybernet.  (*Id.,* p. 1.)  Rodgers

22  appealed State Fund's denial and his claim is pending before the Workers' Compensation Appeals

23  Board ("WCAB").  (*Id.*)

24         4.      The Cybernet defendants' demurrers

25         In September 2015, the Cybernet defendants demurred to the underlying plaintiffs'

26  complaints on the basis of California's workers' compensation exclusivity doctrine.  (RJN, ¶¶ 4-6,

27  Ex. 4-6.)  The Superior Court overruled the demurrers, noting it had not yet been determined

28  whether the plaintiffs were independent contractors or employees.  (RJN, ¶¶ 7-9, Ex. 7-9.)  The

1   Superior Court also noted certain exceptions to the workers' compensation law might apply,

2   including Cal. Labor Code §§ 3601(a)(1) and 3602 (b)(1) and (2).  (*Id.*)

3       **B.     The State Fund Policy**

4               1.     The policy terms

5       State Fund issued policy number 1704509 to Cybernet, effective for the period August 20,

6   2012-2013.  (Nielsen Decl., ¶ 3, Ex. 3.)  The policy afforded workers' compensation and

7   employer's liability insurance.  (*Id.* at ¶ 4, Ex. 4.)  Part One of that form provided that State Fund

8   would pay the benefits required of Cybernet by the workers' compensation law but had no duty to

9   defend a claim, proceeding or suit that was not covered by the policy.  (*Id.* at pp.1-2.)

10      Part Two, "employers liability insurance," says that it "applies to *bodily injury by accident*

11  or *bodily injury by disease*."  (*Id.* at pp. 2-3, italics added.)   Such injury "must arise out of and in

12  the course of the injured employee's employment by [Cybernet]."  (*Id.*)  Section D of Part Two

13  gave State Fund "the right and duty to defend, at [State Fund's] expense, any claim, proceeding or

14  suit against [Cybernet] for damages payable by this insurance."  (*Id.* at p. 3.)  Section C of Part Two

15  contained Exclusion 4, which provided State Fund would not pay "any obligation imposed by a

16  workers compensation, occupational disease, unemployment compensation, or disability benefits

17  law, or any similar law."  (*Id.* at p. 3.)  It also contained Exclusion 5, applicable to "bodily injury

18  intentionally caused or aggravated" by Cybernet.  (*Id.*)

19              2.     State Fund's response to the underlying actions

20      Through counsel, Cybernet demanded that State Fund defend and indemnify it in

21  connection with Doe's, Adams's, and Rodgers's civil suits.  (Tynan Decl., ¶ 3.)  In July 2015, State

22  Fund agreed to defend Cybernet in connection with Doe's, Adams's, and Rodgers's suits, subject to

23  a reservation of rights.  (*Id.* at ¶ 4, Ex. 1.)  On December 7, 2016, State Fund withdrew its defense

24  of Cybernet in connection with Doe's, Adams's, and Rodgers's suits, citing Exclusions 4 and 5.

25  (*Id.* at ¶ 5, Ex. 2.)

26                                    **ARGUMENT**

27      Summary judgment should be granted when there are no genuine and disputed issues of

28  material fact, and when, viewing the evidence most favorably to the non-moving party, the movant

is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; see also *Celotex Corp. v.*
*Catrett*, 477 U.S. 317, 322-23 (1986).  Cybernet seeks partial summary judgment declaring that
State Fund owes a duty to defend Cybernet in the underlying actions.

1.    **State Fund must defend the Cybernet Defendants because a potential exists for**
**liability covered under Part Two of the State Fund policy.**

"To prevail [on the duty to defend], the insured must prove the existence of a potential for
coverage, while the insurer must establish the absence of any such potential.  In other words, the
insured need only show that the underlying claim may fall within policy coverage; the insurer must
prove it cannot." *Montrose Chemical Corp. v. Sup. Ct.*, 6 Cal.4th 287, 300 (1993).  "The duty to
defend is determined by reference to the policy, the complaint, and all facts known to the insurer
from any source." *Id.*  An insurer can avoid the duty to defend *only* when the insured "*can by no*
*conceivable theory raise a single issue which could bring it within the policy coverage*." *Id.* (italics
the Court's), quoting *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 276, n. 15 (1966).  Courts routinely
recognize "the breadth of this duty.  Even the *bare possibility* of coverage is sufficient to trigger it."
*Belmonte v. Employers Ins. Co*., 83 Cal.App.4th 430, 433 (2000) (italics added), citing *Montrose*.
Any doubt whether the facts give rise to a duty to defend is resolved in the insured's favor.  *Horace*
*Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081 (1993).  Once the duty to defend attaches, the
insurer must defend against all of the claims involved in the action, both covered and non-covered.
*Hogan v. Midland National Ins. Co.*, 3 Cal.3d 553, 564 (1970).

The issue here is whether such potential exists under Part Two of State Fund's policy,
which provides coverage for workplace injuries that are not covered under Part One (workers'
compensation).  Part Two "is intended to serve as a gap-filler, providing protection to the employer
in those situations where the employee has a right to bring a tort action despite the provisions of the
workers' compensation statute or the employee is not subject to the workers' compensation law."
*La Jolla Beach & Tennis Club, Inc. v. Industrial Indem*. Co., 9 Cal.4th 27, 36 (1994) (cits. & quots.
om.); see also *Culligan v. State Comp. Ins. Fund*, 81 Cal.App.4th 429, 439 (2000) ("Part 2 covers
situations where the employee, while not 'excluded' from the workers' compensation system, may
not be required to use it exclusively.") (cits. om.).  Stated otherwise, Part Two "protects employers

against lawsuits by employees who are injured in the course of employment, but whose injuries are not compensable under the workers' compensation laws." *La Jolla*, 9 Cal.4th at 36. Thus, Part One covers injuries that occur in the course and scope of employment for which workers' compensation *is* the employee's exclusive remedy; Part Two covers injuries that occur in the course and scope of employment for which workers' compensation is *not* the employee's exclusive remedy.

Here, as further explained below, the underlying actions fall within Part Two because they allege injuries that may fall within exceptions to the workers' compensation exclusivity doctrine. Part Two applies because the plaintiffs' injuries allegedly involved risks outside those normally attendant to employment and thus allegedly outside the workers' compensation system.

**2.     The underlying actions trigger coverage under Part Two because they allege bodily injuries by accident and disease.**

As noted above, Part Two "applies to *bodily injury by accident* or *bodily injury by disease*." (Nielsen Decl., ¶ 4, Ex. 4, pp. 2-3, italics added.) Both options apply here. First, the underlying plaintiffs allege they suffered bodily injury by disease—specifically, HIV—which brings their injuries within the scope of Part Two's coverage. Second, even without their allegations of disease, the plaintiffs allege facts supporting a theory that their injuries were accidental, even if the conduct leading to those injuries was not.

In this regard, in *Merced Mut. Ins. Co. v. Mendez*, 213 Cal.App.3d 41 (1989), the court concluded that a claim alleging sexual assault did not allege a covered "accident" even though the insured argued that he misunderstood the victim's conduct and mistakenly believed that she consented. The court in *Merced Mutual*, however, cautioned that "coverage is not always precluded merely because the insured acted intentionally and the victim was injured." *Id.* at 50. The court explained that, if "the insured acted deliberately with the intent to cause injury, the conduct would not be deemed an accident. Moreover, where the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury." *Id.* On the other hand, "an 'accident' exists when any aspect in the causal series of events leading to the injury or damage was unintended by the insured

1 and a matter of fortuity." *Id.*

2   To illustrate the same point, the court in *Quan v. Truck Ins. Exch.*, 67 Cal.App.4th 583

3 (1998), provided an example of a worker mopping the floor of a restaurant.  The court noted that

4 the act of mopping the floor and causing it to be more slippery is intentional rather than accidental.

5 But when a customer then enters, slips, and falls, the second event may be an "additional,

6 unexpected, independent and unforeseen happening" that directly caused injury, and hence may be

7 an "accident" giving rise to a duty to defend.  *Id.* at 600 n. 16.  More recently, the California

8 Supreme Court recounted the example noted in *Merced Mutual* involving a car accident caused by

9 a speeding driver, noting that, while "the speeding would be an intentional act[, ] … the act directly

10 responsible for the injury—hitting the other car—was not intended by the driver and was fortuitous.

11 Accordingly, the occurrence resulting in injury would be deemed an accident." *Delgado v.*

12 *Interins. Exch. of Auto. Club of So. Cal.*, 47 Cal.4th 302, 316 (2009).

13   Applying these cases to the facts known and alleged in the underlying suits leads to the

14 conclusion that Cybernet faces potential liability for injuries accidentally caused.  Cybernet is in the

15 business of producing videos depicting sexually explicit activity and bondage.  Sometimes the

16 activities depicted appear violent or harmful—but the same is true to a far greater extent in major

17 Hollywood films depicting soldiers (*Saving Private Ryan*), history (*Braveheart*), espionage (*Zero*

18 *Dark Thirty*), and action dramas (*Taken*).  In none is the harm supposed to be real or intended; it is

19 theater.  No one would doubt that injuries suffered by a performer in the filming of any such movie

20 would be considered accidental.  The same is true of the injuries alleged here.

21
22 **3. The underlying actions trigger coverage under Part Two because they allege workplace injuries beyond the normal risks of employment.**

23   Absent an exception, workers' compensation is the exclusive remedy "for any injury

24 sustained…arising out of and in the course of the employment."  Lab. Code § 3600(a).  This

25 exclusivity rule is premised on the idea of a "compensation bargain," where the employee agrees to

26 give up his or her civil remedies in exchange for a "swift and certain payment of benefits."

27 *Fermino v. Fedco*, 7 Cal.4th 701, 708 (1994) (cits. om.).  This bargain, however, assumes there is

28 an agreed upon scope of work with accompanying risks.  If a worker's injuries fall outside that

1    scope of work, workers' compensation is no longer the worker's exclusive remedy.  *Id.* ("certain

2    types of injurious employer misconduct remain outside this bargain").

3        In *Fermino*, the plaintiff employee was a sales clerk whom the defendant employer

4    interrogated in a closed room for an hour about an alleged theft of money on a sale.  The employee

5    later sued for false imprisonment, and the trial court sustained a demurrer based on the workers'

6    compensation exclusivity rule.  On appeal, the *Fermino* court reversed, holding that a claim for

7    false imprisonment fell outside of the rule  The court explained that workplace injuries fell into

8    three potential categories: (1) injuries caused by employer negligence or without employer fault

9    that are compensated at the normal rate under the workers' compensation system; (2) injuries

10   caused by normal employer conduct that intentionally, knowingly or recklessly harms an employee,

11   for which the employee may be entitled to extra compensation under the workers' compensation

12   system; and (3) intentional employer conduct which brings the employer beyond the boundaries of

13   the compensation bargain, for which workers' compensation is not an employee's exclusive

14   remedy.  *Id.* at 713-14.

15       In explaining the third category, the *Fermino* court noted that the critical inquiry was

16   whether the employer intended to engage in *conduct* that fell outside the compensation bargain, not

17   whether the employer intended to *injure* the employee: "any inquiry into an employer's motivation

18   is undertaken not to determine whether the employer intentionally or knowingly injured the

19   employee but rather to ascertain whether the employer's conduct violated public policy and

20   therefore fell outside the compensation bargain."  *Id.* at 714-15.  The court further explained that

21   "normal employer actions causing injury would not fall outside the scope of the exclusivity rule

22   merely by attributing to the employer a sinister intention."  *Id.* at 717.  But "actions by employers

23   that have no proper place in the employment relationship may not be made into a 'normal' part of

24   the employment relationship …."  *Id.*   "What matters," the court explained, is "whether the

25   conduct itself, concretely, is of the kind that is within the compensation bargain."  *Id.* at 718.  The

26   *Fermino* court agreed with the plaintiff that the employer's acts of false imprisonment "were prima

27   facie outside the employer's 'proper role,' irrespective of [the employer's] intent to harm, because

28   they criminally deprived her of her liberty and therefore were beyond the scope of the

1   compensation bargain." *Id.*

2   Per *Fermino*, the type of employer conduct that pushes an employee's injury outside the

3   scope of the compensation bargain includes acts falling within an exception enumerated in the

4   workers' compensation statute—such as physical assaults—or an exception developed in the

5   common law—such as false imprisonment.  *Fermino*, 7 Cal.4th at 720 (noting the statutory

6   exceptions to the exclusivity rule are not "intended to provide an exhaustive list").

7
8   **A.      The underlying actions allege injuries that fall within common law exceptions
             to the workers' compensation exclusivity rule.**

9   State Fund is obligated to defend Cybernet under Part Two because the underlying plaintiffs

10  allege injuries that potentially fall within common-law exceptions to the exclusivity rule.  Such

11  exceptions include conduct constituting assault, false imprisonment, harassment, fraud, and

12  wrongful termination.  *Fermino*, 7 Cal.4th at 710-712.  For example, in *Lee v. W. Kern Water Dist.*,

13  5 Cal.App.5th 606 (2016), the court held that emotional distress suffered by employees when their

14  employer staged a mock robbery for training purposes would fall outside the exclusive-remedy rule.

15  The *Lee* court applied *Fermino* to approve a jury instruction stating, "Employer conduct is

16  considered outside the scope of the workers' compensation scheme when the employer steps

17  outside of its proper role or engages in conduct unrelated to the employment." *Id.* at 618.  The

18  court emphasized that the employer need not have intended to harm the employee; what mattered

19  was that the employer intended to engage in the conduct that harmed the employee.  *Id.* at 628-29.

20  As in *Lee*, the plaintiffs here allege they experienced conduct well beyond the expected

21  risks of the job, and suffered injuries as a result.  (RJN, ¶ 1, Ex. 1, ¶¶ 20, 25-26, 44, 35, 38-39, 49,

22  55, 97-103, 108, 169-174, 180-84, 189; RJN, ¶ 2, Ex. 2, ¶¶ 22, 27, 30-32, 35, 45, 47, 49, 84-90, 95,

23  182, 186, 188, 191; RJN, ¶ 3, Ex. 3, ¶¶ 25, 29, 41, 43, 37, 84-88, 93, 95, 102, 105, 155-57.)   The

24  plaintiffs allege they were hired to perform in videos depicting a certain type of sexual activity in a

25  safe and controlled environment.   (RJN, ¶ 1, Ex. 1, ¶¶ 21-25, 34, 44, 110; RJN, ¶ 2, Ex. 2, ¶¶ 27-

26  28, 30, 84-90; RJN, ¶ 3, Ex. 3, ¶¶ 29, 37, 39-41, 84, 87-88, 93, 95, 102, 105, 155-57.)  The

27  plaintiffs understood Cybernet to have "one of the best reputations" in the adult film industry

28  because of its "respectful and fair treatment" of performers, its "clean, comfortable working

conditions," and its "honest and approachable crew."  (RJN, ¶ 1, Ex. 1, ¶ 23; RJN, ¶ 2, Ex. 2, ¶ 25; RJN, ¶ 3, Ex. 3 ¶ 27.)  The plaintiffs also understood their video shoots would involve the use of condoms and other barriers, and that Cybernet would "ensure that [performers] fully [understood] their rights and [felt] empowered to stop or alter a scene at any time."  (RJN, ¶ 1, Ex. 1, ¶¶ 23, 44, 49; RJN, ¶ 2, Ex. 2, ¶¶ 25, 144; RJN, ¶ 3, Ex. 3, ¶¶ 27, 37, 39.)  The plaintiffs allege, however, that the working environment, in fact, was not controlled, and that they experienced unexpected and aggressive behavior by their co-workers that they were powerless to control.  (RJN, ¶ 1, Ex. 1, ¶¶ 20, 25-26, 44, 35, 38-39, 49, 55, 97-103, 108, 169-174, 180-84, 189; RJN, ¶ 2, Ex. 2, ¶¶ 22, 27, 30-32, 35, 45, 47, 49, 84-90, 95, 182, 186, 188, 191; RJN, ¶ 3, Ex. 3, ¶¶ 25, 29, 41, 43, 37, 84-88, 93, 95, 102, 105, 155-57.)

Whether Cybernet stepped out of its proper role such that workers' compensation should not apply presents questions of fact.  Without a jury determination of this issue, there remains the possibility that the underlying allegations fall under *Fermino*'s third category of workplace injuries and present the type of the *La Jolla* "gap" Part Two was intended to cover.  Because State Fund cannot conclusively demonstrate there is no potential for coverage under Part Two, it is obligated to defend Cybernet in the underlying actions.

### B.   The underlying actions potentially allege injuries that fall within a statutory exception to the workers' compensation exclusivity rule.

The underlying plaintiffs also allege injuries that fall within a statutory exception to the workers' compensation exclusivity rule, namely, injuries caused by physical assaults ratified by Cybernet.  Cal. Lab. Code § 3602(b)(1).  An employer may be held civilly liable for co-worker assault by ratification; such injuries fall outside the workers' compensation system and constitute an exception to the exclusivity rule.  *Fretland v. County of Humboldt*, 69 Cal.App.4th 1478, 1489-91 (1999); see also *Hart v. National Mortgage & Land Co.*, 189 Cal.App.3d 1420 (1987).  Ratification occurs when an employer "adopt[s] in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which…is to treat the act as if originally authorized by him."  *Rakestraw v. Rodrigues*, 8 Cal.3d 67, 73 (1972) (int. cits. om.).  For example, in *Hart*, the court held the workers' compensation exclusivity doctrine did not prevent an

1   employee who alleged a coworker had assaulted him from stating a cause of action against his

2   employer for assault and battery, if the employee could plead the employer knew of the coworker's

3   actions and failed to discipline him.  *Hart*, 189 Cal.3d 1420.

4        Here, the underlying plaintiffs potentially allege conduct that falls under Labor Code §

5   3602(b)(1) because they claim Cybernet ratified physical assaults by Cybernet employees.  For

6   example, plaintiff Doe alleges Cybernet employee Hogan (Darkholme) physically forced Doe to

7   engage in unsafe sex acts, and that Cybernet ratified Darkholme's conduct.  (RJN, ¶ 1, Ex. 1, ¶¶ 97-

8   103, 108, 180-84, 189.)  Plaintiff Adams alleges Cybernet employee Sara Corrigan (aka Lee)

9   directed and engaged in non-consensual sex acts involving Adams—conduct that Cybernet

10  allegedly ratified—causing Adams to contract HIV and suffer other damages.  (RJN, ¶ 2, Ex. 2, ¶¶

11  85, 95, 182, 186, 188, 191.)  Plaintiff Rodgers alleges Cybernet employee Chris Corrigan (aka

12  Tomcat) ignored his request that condoms be used during a video shoot and failed to follow safety

13  protocols when bodily fluids ended up in Rodgers' eye—conduct again allegedly ratified by

14  Cybernet—causing Rodgers to contract HIV.  (RJN, ¶ 3, Ex. 3, ¶¶ 39, 41, 84, 87-88, 93, 95, 102,

15  105.)

16       A claim for emotional distress may also trigger an exception to the exclusivity rule.  For

17  example, in *Herrick v. Quality Hotels, Inns & Resorts, Inc.*, 19 Cal App 4th 1608 (1993), the court

18  held that an action against plaintiff's employer for intentional infliction of emotional distress,

19  allegedly caused when another employee threatened him with a gun, was not barred by the

20  exclusivity rule.  *Id.* at 1617.  The court said the threat constituted a physical assault within the

21  meaning of Labor Code § 3602(b)(1), based on findings that the other employee threatened the

22  plaintiff with a gun, acted within the course and scope of his employment with the intent to injure

23  the plaintiff, and that the plaintiff had suffered emotional distress as a result.  *Id.*

24       Here, the underlying plaintiffs allege Cybernet ratified conduct that caused them emotional

25  distress, including forcing the plaintiffs to engage in unexpected (and sometimes non-consensual)

26  acts (RJN, ¶ 1, Ex. 1, ¶¶ 20, 97-103, 108, 156-165, 169-174, 180-184, 189; RJN, ¶ 2, Ex. 2, ¶¶ 22,

27  85, 95, 143-152, 182, 186, 188, 191; RJN, ¶ 3, Ex. 3, ¶¶ 25, 141-150); forcing the plaintiffs to

28  submit to unsafe working conditions (RJN, ¶ 1, Ex. 1, ¶¶ 169-174; RJN, ¶ 2, Ex. 2, ¶¶ 84-90, 95,

182, 186, 188, 191; RJN, ¶ 3, Ex. 3, ¶¶ 41, 84-87, 155-57); and misrepresenting the terms of employment.  (RJN, ¶ 1, Ex. 1, ¶¶ 97-98, 156-165; RJN, ¶ 2, Ex. 2, ¶¶ 27, 84-90; RJN ¶ 3, Ex. 3, ¶¶ 37, 84-88, 93, 95, 102, 105, 142-49, 155-57.)  Given the allegations of ratification, plaintiffs contend these actions involve claims that fall under Labor Code § 3602(b)(1)'s exception to the workers' compensation exclusivity rule.

In this regard, "[w]hether an employer has ratified an employee's conduct is generally a factual question." *StreetScenes v. ITC Entertainment Group, Inc.*, 103 Cal.App.4th 233, 242 (2002); *Baptist v. Robinson*, 143 Cal.App.4th 151, 169-70 (2006).  "If coverage depends on an unresolved dispute over a factual question, the very existence of that dispute would establish the possibility of coverage and thus a duty to defend."  *Mirpad, LLC v. California Ins. Guarantee Assn.*, 132 Cal.App.4th 1058, 1068 (2005).  Here, the underlying plaintiffs allege Cybernet ratified conduct by Cybernet employees that caused the plaintiffs to suffer bodily injuries by accident and disease.  Because State Fund cannot conclusively eliminate the possibility of that Cybernet will be found liable under such allegations, the plaintiffs' allegations may fall within an exception to the workers' compensation system and thus within the coverage of Part Two.

**4.    State Fund has a duty to defend Cybernet because no policy exclusions preclude coverage.**

"An insurer may rely on an exclusion to deny coverage only if it provides *conclusive evidence* demonstrating that the exclusion applies."  *Atlanic Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 1038-39 (2002) (italics orig.).  Because any potential for coverage gives rise to the duty to defend, *Gray*, 65 Cal.2d at 275-77, the insurer's reliance on an exclusion must prove "that the exclusion applies in all possible worlds."  *Atlantic Mut.*, 100 Cal.App.4th at 1039.  As shown below, State Fund cannot demonstrate any potential exclusion applies "in all possible worlds," such that State Fund has a duty to defend under Part Two.

**A.    The Workers' Compensation Exclusion does not preclude coverage because the underlying plaintiffs allege injuries outside the compensation bargain.**

In its December 2016 letters withdrawing its defense (Tynan Decl., ¶ 5, Ex. 2), State Fund relied in part on Part Two's Exclusion 4, which provided State Fund would not pay "any obligation

1   imposed by a workers compensation, occupational disease, unemployment compensation, or

2   disability benefits law, or any similar law."  As explained above, however, the underlying plaintiffs

3   allege Cybernet engaged in conduct that—although it occurred in the course and scope of

4   employment—created risks beyond the normal risks of employment when it supposedly ratified

5   unexpectedly aggressive and unsafe behavior by other Cybernet employees.  These allegations

6   bring the actions within the coverage of Part Two, which protects employers "in those

7   situations where the employee has a right to bring a tort action despite the provisions of

8   the workers' compensation statute or the employee is not subject to the workers'

9   compensation law…."  *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 41 Cal.3d 903, 916

10  (1986) (cits. om.).

11         In determining whether there is a duty to defend, State Fund must consider the allegations in

12  the underlying complaints and any extrinsic facts it has learned.  *Waller v. Truck Ins. Exchange,*

13  *Inc.*, 11 Cal.4th 1, 19 (1995); *Montrose*, 6 Cal.4th at 296.  As explained above, the underlying

14  complaints allege injuries that potentially fell outside the normal risks of employment and thereby

15  support a finding of potential liability within the coverage afforded in Part Two.

16         Extrinsic facts also support a finding of coverage because they demonstrate uncertainty

17  surrounding the circumstances of the plaintiffs' injuries.  The plaintiffs have made workers'

18  compensation claims but their claims have not yet been adjudicated.  (Tynan Decl., ¶¶ 6-9.)  No

19  final determination has been made as to whether the plaintiffs were Cybernet's employees, whether

20  their injuries arose in the course and scope of employment, or whether the alleged injuries were

21  part of the employment bargain.  (*Id.*)  In September 2013, State Fund denied Doe's worker's

22  compensation claim on the basis that the injuries alleged were not incurred in the course and scope

23  of employment; that denial has been appealed.  (*Id.* at ¶ 7, Ex. 3.)  State Fund also denied Adams's

24  claim for disability benefits on grounds that she did not miss work time as a result of her injuries;

25  that denial too has been appealed.  (*Id.* at 9, Ex. 5.)  State Fund also denied Rodgers's worker's

26  compensation claim for his HIV-related injuries on grounds that the injuries were not incurred in

27  the course and scope of employment; that denial too has been appealed.  (*Id.* at 8, Ex. 4.)  Finally,

28  when the Superior Court overruled Cybernet's demurrers, the Court noted it was uncertain whether

1    workers' compensation was the plaintiffs' exclusive remedy.  (RJN, ¶¶ 7-9, Ex. 7-9.)

2         Given the current status of the underlying actions and workers' compensation claims, State

3    Fund cannot definitively establish that Cybernet's alleged injurious conduct was within the normal

4    risks of the work so as to fall within the exclusivity rule and outside the coverage of Part Two.  As

5    a matter of law, then, State Fund cannot prove there is no potential for liability covered under Part

6    Two, which means State Fund is obligated to defend Cybernet.  *Culligan*, 81 Cal.App.4th at 435

7    ("Any doubt as to whether the facts give rise to a duty to defend [under Part Two] is resolved in the

8    insured's favor.") (cits. om.); see also *Arriaga v. County of Alameda*, 9 Cal.4th 1055, 1060 (1995)

9    (where allegations establish the conditions for compensation, the complaint is subject to a general

10   demurrer unless it also alleges facts that negate application of the exclusive remedy rule,).  Here,

11   the sufficiency of the claims asserted in the underlying actions has been tested by demurrers, and

12   the Superior Court overruled them because it was not convinced that the exclusive-remedy rule

13   applied.  (RJN, ¶¶ 4-9, Ex. 4-9.)   Thus, State Fund cannot conclusively show there is no potential

14   for coverage under Part Two.

15
16        **B.    The intentional-injury exclusion does not preclude coverage because State
                Fund cannot prove Cybernet intended to injure the underlying plaintiffs.**

17        State Fund also relied in part on Part Two's Exclusion 5, which provided State Fund would

18   not pay for damages arising out of "bodily injury intentionally caused or aggravated" by Cybernet.

19   (Tynan Decl., ¶ 5, Ex. 2.)  As explained above, however, the underlying plaintiffs allege only that

20   Cybernet ratified the conduct of others.  By its terms, Exclusion 5 only applies to injuries caused or

21   aggravated by Cybernet itself.  The exclusion on its face does not apply to the conduct alleged.

22        Moreover, even as to the conduct of Cybernet itself, an intentional-injury exclusion applies

23   only if the insured acted with the intent to cause the injury; it does not apply if the insured merely

24   acted intentionally.  *Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865, 887 (1978) ("intentional" or

25   "willful" conduct within the meaning of traditional tort principles will not exonerate an insurer

26   from liability unless it is done with a "preconceived design to inflict injury"); *Gonzalez v. Fire Ins.*

27   *Exch.*, 234 Cal.App.4th 1220, 1240 (2015) ("One may commit an intentional act without

28   subjectively intending or expecting damages.")  As to such claims, "the determination of whether

1   the insured engaged in intentional, negligent or even wrongful conduct depend[s] upon the

2   [ultimate] judgment …. The carrier's obligation to indemnify inevitably will not be defined until

3   the adjudication of the very action which it should have defended." *Gray*, 65 Cal.2d at 271-72.

4   Here, there has been no determination that Cybernet intended to inflict the injuries alleged in the

5   underlying actions; this issue cannot be determined until the underlying actions have been

6   adjudicated. Thus, State Fund cannot conclusively show that the intentional-act exclusion

7   precludes coverage for the underlying actions.

8        While State Fund may argue that for Part Two to apply, Cybernet must have acted

9   intentionally and therefore coverage is precluded under Exclusion 5, this argument misses the

10   distinction between Exclusion 5, which requires an intent to injure, and liability under *Fermino,*

11   which requires only intent to act. Part Two is a gap filler that addresses the gap between these two

12   settings. To fall within Part Two, an injury must fall under *Fermino*'s third category of workplace

13   injuries: injuries that result from intentional conduct by the employer that is outside the

14   compensation bargain. *Fermino* does not, however, require that the employer intended to injure the

15   employee; *Fermino* requires that the employer intended to engage in conduct that incidentally

16   injured the employee. *Fermino*, 7 Cal.4th at 714-15. This distinction parallels the holdings in

17   *Gonzalez* and *Clemmer*, which held an exclusion for intentional acts would only apply if the

18   insured actually intended to injure, not that the insured simply engaged in intentional conduct.

19   Because State Fund cannot show that Cybernet intended the alleged injuries to occur, the

20   intentional-injury exclusion cannot preclude coverage.

21                    **CONCLUSION**

22        Any potential for coverage gives rise to the duty to defend. *Gray*, 65 Cal.2d at 275-77. To

23   trigger the duty to defend, Cybernet need only show that the underlying actions allege claims that

24   *may* fall within the State Fund policy. *Montrose,* 6 Cal.4th at 300. "Facts merely tending to show

25   that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility

26   that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore

27   add no weight to the scales." *Id*; see also *Mirpad*, 132 Cal.App.4th at 1068 (unresolved factual

28   disputes establish possibility of coverage and duty to defend). Exclusions are construed narrowly

1   and coverage provisions broadly.  An insurer "may rely on an exclusion to deny coverage only if it

2   provides conclusive evidence demonstrating the exclusion applies." *Atl. Mut. Ins. Co.*, 100

3   Cal.App.4th at 1038-39.  Cybernet disputes that it intended to cause the injuries alleged in the

4   underlying actions and State Fund cannot produce conclusive evidence to the contrary.  Further, the

5   underlying actions allege injuries caused by Cybernet's ratification of the actions of others, which,

6   by the language of Exclusion 5, are not precluded.  Given the possibility that at least some of the

7   alleged injuries fall under Part Two, the Court should find that State Fund has a duty to defend

8   Cybernet.

9        For the forgoing reasons, the Cybernet defendants respectfully request that the Court find

10  State Fund has a duty to defend Cybernet.

11

12  May 23, 2017                              Respectfully submitted,

13                                            NIELSEN, HALEY & ABBOTT LLP

14

15                              By:    /s/ James C. Nielsen                   .

16                                     James C. Nielsen
                                       Attorneys for Defendants
17                                     CYBERNET ENTERTAINMENT, LLC; KINK STUDIOS,
                                       LLC; ARMORY STUDIOS, LLC; AND PETER ACWORTH
18                                     and for Third Party Plaintiff CYBERNET
                                       ENTERTAINMENT, LLC
19

20

21

22

23

24

25

26

27

28